IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

SELENA VEDRO,     )
   Plaintiff,    )
        )
  vs.      )  Civil Action No. 04-1730
        )
DEL MONTE FOODS,    )  Judge McVerry
   Defendant.   )  Magistrate Judge Hay
        )

REPORT AND RECOMMENDATION

I.  Recommendation

It is respectfully recommended that the motion for summary judgment submitted on behalf of Defendant (Docket No. 25) be granted.

II.  Report

Plaintiff, Selena Vedro, brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII"), and the Pennsylvania Human Relations Act, 43 P.S. §§ 951-63 ("PHRA"), against her employer, Defendant Del Monte Foods ("Del Monte"). She alleges that Del Monte created a sexually and/or racially hostile working environment, discriminated against her with respect to her salary on the basis of her race and gender and retaliated against her for engaging in protected activity.

Presently before this Court for disposition is a motion for summary judgment, submitted on behalf of the Defendant.  For the reasons that follow, the motion should be granted.

Plaintiff, an African-American female, was hired by Weight Watchers, a division of H.J. Heinz Corporation, on September 15, 1995, in its customer service department.  (Vedro Dep. at 26.)[1]  She left that position in 1998 to accept the job of Marketing Assistant in the Special Products marketing department, working for Greg Davis.  On or about May 18, 2000, she applied

---

[1]The deposition of Selena Vedro and exhibits thereto are attached to Defendant's Appendix (Docket No. 28) as Exhibit A.

for and on June 1, 2000 she accepted a promotion to the position of Materials Planner, reporting to Margie McMullan.  (Id. at 26-27, 29-30, 37-39; Pl.'s App. Ex. 1.[2])  In December 2002, Del Monte acquired certain of Heinz's business units and Plaintiff became a Del Monte employee. (Vedro Dep. at 57.)

As a Materials Planner, Plaintiff was responsible for all aspects of planning, ordering and obtaining the required number of soup labels from third-party printers in order to meet needs of Del Monte's soup factories.  (Id. at 51; see also Vedro Dep. Ex. 4.)

When Plaintiff moved into the Materials Planner position in June 2000, she received a salary increase from $27,430 to $32,160, an increase of almost 19 percent.  However, she was paid below the minimum salary for the position for the first six months.  Defendant asserts that this was consistent with Heinz's practice, although the testimony of Del Monte's compensation manager, James Kennedy, is actually that it was possible that Plaintiff was paid less than the minimum for the new position because she did not possess all the prerequisites for it and that he was aware of others who were paid less than the minimum.  (Kennedy Dep. at 12-15.)[3]

Plaintiff states that she had never heard of this practice and that co-workers in her department told her they received their salary increases at the time they were promoted.  (Vedro Dep. 103-06; see also Sennett Dep. at 19-20.[4])  After six months, in January 2001, Plaintiff's performance was evaluated and her salary was increased to $37,200, just above the minimum salary for the position.  (Vedro Dep. at 79-81, 100-01, 104-05.)

_____

[2]Plaintiff's Appendix is attached to her Brief in Opposition to Del Monte's Motion for Summary Judgment (Docket No. 29).

[3]Docket No. 28 Ex. F.

[4]Pl.'s App. Tab 31.

<u>The Harmonization Process</u>

In December 2002, when Del Monte acquired certain Heinz business units, Del Monte decided to overhaul its entire compensation system, a process known as "harmonization."  One component of this process was to assign to all former Heinz employees a salary grade level (Heinz did not use salary grade levels).

Del Monte explained to its employees in a Power Point presentation how the harmonization process was performed:

> The job evaluation approach of the past was the Hay evaluation method.  The new job evaluation approach is Market Pricing.  The position/salary grade for your job is determined by comparing it to similar jobs and pay levels in the labor market, and to similar positions within the company.  It then determines your level of pay, and in some cases, bonus eligibility, etc.

(Pl.'s App. Tab 3 at DMF-VED 00687.)

Plaintiff notes that, contrary to Del Monte's Power Point presentation, there was no labor market analysis performed and there was no input from her supervisors.  (Kennedy Dep. at 24-25.)[5]  James Kennedy, Director of Compensation Programs for Del Monte, admitted that the assignment was made mechanically; that is, he assigned salary grade levels – which determine salary ranges, not actual salaries – by matching the documented Heinz salary midpoints to Del Monte's grade levels.  There was no independent analysis or evaluation done for any position. (Kennedy Dep. at 18-23;[6] Vedro Dep. at 119-20 & Ex. 14 at DMF-VED 00687.)

All employees were informed by memorandum in August 2003 what their salary grade levels would be.  Plaintiff was informed that her position was assigned a salary grade 10.  As such, she was not eligible for a bonus under Del Monte's compensation scheme, under which employees were not bonus-eligible until grade level 13.  (Vedro Dep. at 120, 122 & Ex. 15.)

---

[5]Pl.'s App. Tab 29.

[6]Docket No. 28 Ex. F.

Bridget Uhrig, a Label Development Specialist, was the only other employee in the same department who received a salary grade 10.  All others received a grade 13 or higher.  (Pl.'s App. Tab 9.)

Plaintiff and Uhrig complained to Mike Oakes, their department manager, that their salary grade levels were too low.  Oakes agreed, as he believed that all positions in his department should have been bonus-eligible.  He told Plaintiff and Uhrig that he would attempt to increase their grade levels.  (Vedro Dep. at 121-23; Oakes Dep. at 45-50.[7])

Oakes advocated his position with Kennedy (who had been employed only by Heinz) and, based on Oakes's representations about how Del Monte evaluated positions on the West Coast (as Oakes had been employed only by Del Monte), Kennedy agreed to increase their salaries to the bonus-eligible level of 13.  Oakes promptly informed Plaintiff and Uhrig that their salary grade levels would be increased to 13.  (Kennedy Dep. at 8, 30; Oakes Dep. at 56-57, 63; Vedro Dep. at 133-34.)

Plaintiff assumed that the salary grade change had been entered into the system and she did not inquire again about her salary grade level until approximately six months later.  On March 9, 2004, Plaintiff contacted Human Resources Manager Lisa Sennett to inquire as to whether her salary grade had been changed to a salary grade 13 so that she could qualify for a bonus.  On March 12, 2004, Sennett informed Plaintiff that she spoke to Kennedy and the matter was now resolved.  (Pl.'s App. Tab 5.)  That same day, Oakes sent Lanny Shoup (Oakes's manager) an email stating that he followed up with Kennedy also and confirmed that both Plaintiff and Uhrig were eligible for the bonus as he had promised them in August 2003.  (Pl.'s App. Tab 6.)

---

[7]Docket No. 28 Ex. C.

Kennedy admitted that Oakes spoke to him about Plaintiff and Uhrig's salary grades and that he agreed to change both of them to a salary grade 13.  (Kennedy Dep. at 25-27, 31.)[8]  The Personnel Form authorizing the change for Bridget Uhrig was prepared on March 4, 2004 with an effective date of April 1, 2004 and the form for Plaintiff was prepared on May 18, 2004 with an effective date of June 1, 2004.  (Pl.'s App. Tabs 7-8.)

On April 1, 2004, Margie McMullan (Plaintiff's former manager) sent an email to Kennedy inquiring as to whether Plaintiff and Uhrig's salary grades had been adjusted to a salary grade 13.  On April 5, 2004, Kennedy responded, "Grade adjustments done."  (Pl.'s App. Tab 10.)  At that point, both individuals were now a salary grade 13.  (Vedro Dep. at 137-38; Oakes Dep. at 65-66[9].)

The 2004 Reevaluation and Readjustment

On April 7, 2004, Plaintiff sent Kennedy an email asking what the minimum was for a salary grade 13 position.  That same day, Kennedy responded, "I've provided the details I have to Lisa Sennett, your HR Generalist.  Lisa is your primary contact for all HR matters."  (Pl.'s App. Tab 10.)  Plaintiff therefore sent Sennett an email that same day asking her what the minimum was for a salary grade 13 position.  Sennett responded that the minimum for a salary grade 13 position was $51,760.  (Pl.'s App. Tab 11.)

On April 12, 2004, Oakes sent Kennedy an email asking for his input and advice regarding Plaintiff and Uhrig.  Specifically, Oakes stated that he was unaware of either of the employees being below the minimum after they were re-slotted to a salary grade 13.  That same day, Kennedy responded that they changed grades to harmonize and "now folks are looking for money.  Automatic money might be mistake number two, and two wrongs would not be right. . .

---

[8]Pl.'s App. Tab 29.

[9]Pl.'s App. Tab 30.

We should start over and ensure that the jobs are very close, if not identical." (Pl.'s App. Tab 12.) Oakes was not in agreement with Kennedy's strategy and expressed the same in an email to him on April 12, 2004 in which he stated:

> I'll forward the emails, but we should use caution since we communicated the salary grade to the employees and it impacts bonus. And for the record, I believe 13 is the correct level of these positions.
>
> On the automatic money, I'm not necessarily suggesting that we increase to the minimum, just looking for HR direction. I've had other employees below the minimum before, but they were in training, not incumbents.

(Pl.'s App. Tab 13.)

Because she had not received a response to her prior inquiries, on May 6, 2004, Plaintiff sent Kennedy and Sennett an email asking for an update on the status of her salary grade change and whether her minimum salary would be adjusted to correspond with the minimum of a salary grade 13 position. She also requested a meeting with HR to discuss this matter. In subsequent emails between Kennedy and Sennett that day, Kennedy stated, "I still maintain that the alignment of these roles to grade 13 was artificial and a full-blown analysis might be justified. When I mentioned this to Mike he was not supportive . . . the new grades are cast in concrete." (Pl.'s App. Tab 14.)

At this time, Kennedy took the opportunity, for the first time, to conduct a market evaluation of the Materials Planner position to confirm its proper grade level. (Oakes Dep. at 65; Kennedy Dep. at 68-69; Vedro Dep. at 132-33 & Ex. 16; Sennett Dep. at 51.[10])

On May 10, 2004, Kennedy sent Oakes an email discussing the Hewitt survey for salary grade 10 and 13 positions. On May 12, 2004, Oakes responded to Kennedy's email by stating, "With respect to the Hewitt and FIG research, this role appears to fall between the two you listed. I believe this position procures specialized items (designed/directed by each customer), but does

---

[10]Docket No. 28 Ex. G.

not negotiate contracts.  It does appear closer to the 13 [than] the 10 description, in my opinion."

Kennedy responded "If it falls between ... it falls below grade 13."  (Pl.'s App. Tab 15.)  On May

17, 2004, Sennett sent Plaintiff an email stating that Sennett, Oakes and Kennedy met to discuss

her salary grade, that they were still in discussion and should have an answer for Plaintiff by the

end of the week.  (Pl.'s App. Tab 16.)

      Based on Kennedy's market evaluation, he assigned the Materials Planner position a

grade level 12.  Kennedy did not know Plaintiff's race at the time of this assignment.  (Kennedy

Dep. at 129.)

      On June 7, 2004, Sennett sent Plaintiff an email stating that Sennett and Oakes would like

to meet with Plaintiff at 2:00 p.m. to review the status of her salary grade and other important

information.  (Pl.'s App. Tab 17.)  During that meeting, Oakes informed Plaintiff of the change,

admitting that "he made a mistake in telling [her] ahead of time that [she] should have been a

grade 13," before a market evaluation was completed.  (Vedro Dep. at 145; Kennedy Dep. at

122-23 & Ex. 16.[11])  Plaintiff points out that Del Monte had already decided to change her salary

grade from a 13 to 12 as early as May 19, 2004.  (Pl.'s App. Tab 18.)

      Oakes indicated in an email to Sennett that:

> I had a brief follow up meeting with Selena Vedro on 6/9 to discuss her reaction
> to the job meeting we had with her on 6/7.  She advised she accepted the changes,
> would not be disgruntled, but thought she should still receive a bonus due to her
> involvement and impact on Customer Service case fill rates.  I advised her that
> was not the criteria our Company used to determine which job levels are bonus
> eligible.
>
> She thanked me for my support, but indicated she was not happy with "HR" (no
> specific person(s) were mentioned).  She further indicated that she has been in
> contact with an attorney, who advised her "not to give HR anything."  I will keep
> a close eye on the situation and advise you of any activity in this area.

(Pl.'s App. Tab 19.)

---

[11]Docket No. 28 Ex. F.

On June 14, 2004, Del Monte sent Plaintiff a check for $4,833.20, which represented retroactive pay back to August 2003.  (Kennedy Dep. at 134-35;[12] Sennett Dep. at 65-68.)  See Pl.'s App. Tab 20.  Del Monte states that, because of the inconsistent information that had been given to Plaintiff, as well as the months it had taken the company to conclusively resolve the situation, it was allowing her to retain her bonus eligibility for fiscal 2004 (that is, she was treated as if her position were a grade level 13), she was paid a $3,500 bonus, and was given a salary increase, retroactive to August 2003, raising her salary to the minimum for grade 12, or $47,000.  (Sennett Dep. at 67-68; Vedro Dep. at 150-53.)  Plaintiff contends that this represented an attempt to "buy her silence," noting that Kennedy indicated he could not recall a single case of someone being provided with retroactive pay related to the harmonization process.  (Kennedy Dep. at 45-46, 137-39.)

Plaintiff believed that she was being treated differently than Uhrig and every other member of the department.  She states that Oakes asked her not to pursue the issue any further.  (Vedro Dep. at 152-53.)  Despite this, Plaintiff filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission (EEOC) on or about June 29, 2004.  (Vedro Dep. at 218-19 & Ex. 25.)

The Email Incident

On July 21, 2004, Plaintiff wrote an email to Oakes and to Gretchen Crawford, her new immediate supervisor.  In that email, she brought several things to their attention.  She also had two questions, which she placed in bold and underlined:

**Since label demand is very heavy out of Pittsburgh, does this mean that I will have to place additional orders to meet the demand out of Pittsburgh? Or is this demand in Mendota replacing what I will need in Pittsburgh?**

(Pl.'s App. Tab 23; see Vedro Dep. at 191-92.)

---

[12]Pl.'s App. Tab 29.

Oakes states that he was taken aback by the tone of the email, based on Plaintiff's use of bold and underline font, particularly since the email was one of her first communications with Crawford as her new manager. (Oakes Dep. at 185-86.) He wrote that "I find its tone, AND FONT unacceptable, especially given your new reporting relationship, which was presented to the whole group less than 24 hours ago." (Pl.'s App. Tab 23.)

On July 22, 2004, Plaintiff wrote "I did not intend the font to be misinterpreted. It was my way of stressing that I forsee [sic] problems with customer service and I didn't know how else to covey that. In no way was I intending to be disrespectful to anyone nor was it my intention to offend anyone." (Pl.'s App. Tab 23.) Oakes and Plaintiff also had a "brief conversation" about the email, and Plaintiff "apologized if [Oakes] felt that in any way I was being disrespectful or just nasty." (Vedro Dep. at 191-92.) Oakes accepted Plaintiff's apology during that conversation and states that, as far as he was concerned, the matter was resolved. He did not consider anything he said to be disciplinary in nature. (Oakes Dep. at 186, 214; Vedro Dep. Ex. 24.) Crawford indicated that she had no problem with this and understood that Plaintiff was only trying to emphasize portions of her email. (Vedro Dep. at 191; Crawford Dep. at 29-31.)

Plaintiff was so upset by Oakes's actions in response to her email that, on July 23, 2004, she filed a complaint with the head of Human Relations in San Francisco, Richard Muto, complaining that Oakes was harassing her and retaliating against her. (Pl.'s App. Tab 24; see Vedro Dep. at 194-95.) Del Monte assigned Connie Jenkins, its Senior Manager for Diversity, to investigate the alleged harassment. (Jenkins Dep. at 43, 57-58.)[13] Jenkins reported to Muto that:

> I called Selena last Friday, but apparently she was already gone for the day. We connected first thing this morning. I had already spoken with Mike Oakes at length on Friday regarding this issue. He assured me that Selena was the one who

---

[13]Pl.'s App. Tab 35.

kept bringing this e-mail issue up.  He said that he thought that the issue was closed, but that SHE brought it up during their meeting on 7/22/04 and wouldn't let it die.  He said that he was fully aware of the non-retaliation issue and that he was being extremely careful with Selena.  However, her performance is an issue and he can't ignore that.  I gave him some wording that he should include in her F'04 PDR (which she has not received yet).  I hope he follows my advice and adds it – he said he would.

Now, on the other hand, Selena states that Mike is the one who won't let it die.  Her story is the complete opposite of Mike's.  She claims that HE brought it up during the 7/22/04 meeting and that she continues to be baffled by his objection to the font that she used in her e-mail.  She said that her direct supervisor, Gretchen, had not been offended at all.  She doesn't understand why Mike would bring it up 2 more times after she had apologized.  That's why she sent her e-mail to you.

Mike had followed up Thursday night with another e-mail to Selena (which she selectively did not forward to you), that stated that the matter was closed – no more apologies needed.  I told her that I had already spoken with Mike, and that he felt it was a closed issue – let's move on with business.  She agreed.  I told her that this matter had nothing to do with her filing a complaint.  I talked about non-retaliation and how Mike was well aware of our policies and would not retaliate against her because of the EEOC charge.  I asked her if this issue had been resolved in her mind.  She said she is still baffled by Mike's behavior, but she said that there was nothing she wished me to do at this point.  She thanked me for following up with Mike and with her.  I told her that if anything else came up that troubled her, to give me a call.

I hope that's the end of it.

(Pl.'s App. Tab 25.)

Plaintiff states that, because it was obvious to her that Jenkins was not seriously investigating the harassment and retaliation by Oakes, and fearing further harassment and retaliation if she did not let the issue die, she finally gave up and told Jenkins to close her investigation.  (Vedro Dep. at 197; Jenkins Dep. at 61.)

<u>The 2004 Performance Review</u>

Plaintiff expected to receive her 2004 performance review from Oakes sometime in June or July 2004, but it did not occur until August 3, 2004.  Oakes's review of Plaintiff's then-supervisor, Margie McMullan (who is white), also did not occur until August 2004.  (Vedro Dep.

at 177-78, 184-85 & Exs. 20, 21; Oakes Dep. at 210-11.[14])  Oakes states that his reviews of Plaintiff and McMullan were delayed because he wanted to include comments in both regarding an excess label ordering problem for which he held both individuals accountable, a problem that resulted in a $1.5 million write-off.  The problem was so significant that Oakes had to formally report the matter to the Chief Operating Officer of Del Monte, the Vice-President of  Supply Chain and the General Manger of the StarKist business unit (to whom the write-offs would be charged).  (Oakes Dep. at 149-53;[15] see Vedro Dep. Ex. 13; McMullan Dep at 54.[16])

Plaintiff contends that Oakes harassed and retaliated against her by unfairly reprimanding her for allegedly ordering too many soup labels.  She explains that, while it is true that she had ordered a large excess supply of labels, there were two reasons for this.  First, Oakes had made it clear when he took over as Department Director that he wanted his staff to err on the side of customer service.  With Plaintiff's job, that meant ordering extra labels.  (Crawford Dep. at 37-38; McMullan Dep. at 44-45.)[17]  That is because her job is a balancing act.  On the one hand, she must order sufficient labels to meet potential customer orders.  On the other hand, she has to keep the label inventory from getting too high as any change to the label (design, regulations, ingredients, etc.) can make all or some of the inventory of labels obsolete.  (Shoup Dep. at 67-68;[18] Crawford Dep. at 37-38; McMullan Dep. at 33-34.)

Plaintiff states that Oakes made it clear that he wanted her to err on the side of having excess labels so that no customer would ever be turned away or delayed because there were not

---

[14]Docket No. 28 Ex. C.

[15]Pl.'s App. Tab 30.

[16]Docket No. 28 Ex. D.

[17]Pl.'s App. Tabs 32-33.

[18]Pl.'s App. Tab 34.

enough labels for the product that they wanted to order.  However, she was concerned that this would lead to major label write-offs, and questioned him about this possibility.  Oakes responded by telling her that if was less than $50 million, not to worry about it as he had "broad shoulders." (Vedro Dep. at 167; Shoup Dep. at 85; McMullan Dep. at 46.)[19]  It is undisputed that Plaintiff was not in a position to disobey Oakes's instructions.  (Shoup Dep. at 88.)

Plaintiff asserts that Oakes tries to justify his actions by claiming that he had given her specific instructions on how much extra inventory she was to order.  (Oakes Dep. at 131-32.) She contends that McMullan testified that Oakes did not give such specific instructions until after the excess inventory had been ordered.  However, Plaintiff's citation to the record does not support this contention: McMullan states only that she went to Oakes to discuss the problem they were having, not that he then gave her specific instructions that he had not given earlier. (McMullan Dep. at  45-46.)

The other factor accounting for the excess label order was that Plaintiff received inaccurate data from two sources.  One was a systems report that provided her with incorrect numbers for forecasting sales.  (Shoup Dep. at 78-81.)  The other was an Access database created by Gretchen Crawford.  Crawford had used the database in her job that she thought could be converted so that Plaintiff could use it for forecasting labels.  (Vedro Dep. at 162-64; Crawford Dep. at 40.)  Oakes and McMullan approved of her using the Access database.  (Oakes Dep. at 137-38; Crawford Dep. at 41-42.)[20]  Plaintiff and Crawford tested the new reports for a couple of weeks by comparing them to the MRP reports, and the Access database appeared to work well. (Vedro Dep. at 163.)  However, a problem later developed and the Access database began to give

---

[19]Plaintiff notes that Oakes disputes this assertion, claiming that he said only $50,000. (Oakes Dep. at 144-45.)  For purposes of this motion, Plaintiff's version of the remark is accepted as true.

[20]Pl.'s App. Tabs 30, 32.

Plaintiff incorrect data.  (Vedro Dep. at 163-64; Shoup Dep. at 80; McMullan Dep. at 46-47.)

She caught this glitch and immediately took it to both McMullan and Crawford, the latter

thinking that someone had altered one of the queries in the database.  (McMullan Dep. at 47-48;

Vedro Dep. at  163-64; Crawford Dep. at 42-45.)  They never discovered who might have done

that, but the damage had been done and excess label inventory had been ordered.  Crawford and

McMullan both testified that Plaintiff was not to blame for the database error.  (Crawford Dep. at

42-46; McMullan Dep. at 48-49.)  Plaintiff states that Oakes disputes all of the testimony about

the Access database causing her to order excess inventory, claiming that it was only a minor

factor in the excess inventory issue.  (Oakes Dep. at 136-40.)

> In Oakes's performance evaluation of Plaintiff, he wrote that:

> Although you received a center tier rating for the past year (fiscal year 04 ending
> April 30, 2004), it must be noted that when I returned from a leave of absence in
> mid April 2004, circumstances came to my attention that are a matter of serious
> concern to me.  I discovered that an excess of over $1,500,000 worth of labels had
> been incorrectly ordered over a 2 ½ month period, Aug. thru mid October, 2004.
> This is your area of responsibility.  You had indicated that part of the problem was
> the new system (access database), but that in addition, you did not thoroughly
> understand how the system worked or how to analyze MRP reports.  We offered
> BPCS and MRP training, which you took [in] March 04 and Dec. 03 respectively.

> As we proceed into F05, I still have concerns with regard to your understanding of
> the MRP system.  When I asked you this month for an explanation of our on-hand
> label inventory and the quantity of labels that were obsolete or were going to be
> obsolete by the end of the fiscal year, it required several attempts before you
> provided me with the correct information.

> As part of your F05 PDR, I will ask that you undergo more BPCS and MRP
> training so that you will have the tools you need to execute your job successfully.

(Pl.'s App. Tab 26.)  Plaintiff signed the evaluation, but noted that she "disagree[d] with the

comments contained herein and will provide a rebuttal statement shortly."

> Oakes states that his comments in her review did not affect Plaintiff's center-tier rating,

and they did not affect her merit increase in any way, because he had already made his

13

recommendations regarding salary increases.  (Oakes Dep. at 210-11.)[21]  As noted above, Oakes placed the same comments in Margie McMullan's review and it did not affect her rating either. (McMullan Dep. at 54.)

APICS Certification

Plaintiff states that she was excluded from Certified Production and Inventory Management training, referred to as APICS (American Production & Inventory Controlling School) certification.  (Vedro Dep. at 185.)  This certification is expensive to obtain and was not required for Plaintiff to perform her job.  (Oakes Dep. at 32-33.)  Plaintiff described it as "desired certification to have" because "[i]t looks good on your resume."  (Vedro Dep. at 160.)  Oakes denied her request to attend the training.  (Id. at 173-74.)

Del Monte notes that, at the time Plaintiff sought APICS certification, she had received other training more directly related to her Materials Planner position, including training with an expert on the electronic replenishment (ERP) system used by everyone involved in Del Monte's supply chain and one-on-one training sessions relating to Del Monte's MRP and DRP systems as well.  (Vedro Dep. at 86-89 & Ex. 13 at DMF-VED 00412.)  No one else in Oakes's department obtained APICS certification.  Gretchen Crawford, a manager, attended at least one session, but did not complete the training.  Oakes, because of budgetary constraints, could only send one person.  He selected Crawford, out of all others in the department, based on her area of responsibility and past experience.  Plaintiff believes that Lynn Ferri also attended a session, but acknowledges that Ferri did not complete the training either.  (Vedro Dep. at 213-14; Oakes Dep. at 34.)

_____

[21]Docket No. 28 Ex. C.

Plaintiff asserts that Laura Mauro and Dennis Rich, the other two members of the department, did not want to attend the training.  (Vedro Dep. at 213-15.)  However, she has provided no support for this contention, other than her own testimony.

Increased Workload

On August 23, 2004, Plaintiff told Lanny Shoup in an email that she was requesting help with her workload because:

> The label monitoring has greatly increased in my area due to customers choosing to use Fort Dearborn as their designated printer.  At one time the customer split was about 50/50 between [Renaissance Mark] and myself.
>
> Due to the inordinate amount of [Renaissance Mark] customers choosing now to use Fort Dearborn as their printer, my duties have increased significantly.

(Vedro Dep. Ex. 22; see Vedro Dep. at 186-87.)  It appears that Teresa Ecrement, an independent contractor working on-site at Del Monte, was an employee of Renaissance Mark (a label company) who worked exclusively on Renaissance Mark matters and was not permitted to assist Plaintiff with duties relating to the work of other printers.  (Vedro Dep. at 185-86; Shoup Dep. at 13-14; Oakes Dep. at 171-73;[22] Crawford Dep. at 54-55.)

Shoup thought that she could handle the increased work without any assistance if there were some modifications in the role and some adjustments were made in how things were handled.  (Shoup Dep. at 58-59.)  Shoup discussed this with Oakes, who, he thought, agreed with his suggestions.  However, despite her taking on those additional duties, Shoup does not think that the modifications he suggested (that were necessary in order to allow her to do the job without assistance) were ever implemented by Oakes.  (Shoup Dep. at 60.)

---

[22]Pl.'s App. Tab 30.

Shoup forwarded Plaintiff's email to Oakes, who forwarded it to Lisa Sennett. Sennett inquired if Oakes thought Plaintiff's job had changed significantly enough so that the level of responsibility may have changed her grade. Oakes responded as follows:

> Absolutely no change [in] grade is warranted here!!
> There is a shift in workload, as has been the case in many positions, but not to the point we need another "headcount" to accomplish the tasks. As we move more volume to the Fort Dearborn printer, we will explore whether we actually need an in-house printer expediter (which is Teresa Ecrement's position today with [Renaissance Mark]). Fort Dearborn is willing to deploy an expediter to our location, or give us $50,000 off the cost of labels each year w/o the expediter. Interestingly, I had asked [Plaintiff] a few months ago if she could handle ordering all the labels, and her response was yes.

(Vedro Dep. Ex. 22.)

Plaintiff indicates that her workload also expanded because of a new FDA regulation requiring trans fat information to be included on food labels, routine label conversions, a new product line and a change in the manner in which Del Monte documented label changes, all of which resulted in the need for increased label ordering. (Vedro Dep. at 186-89 & Ex. 22.) These business-related changes also affected the workload of other employees in her department, including Crawford and Oakes. (Crawford Dep. at 73-74[23]; Oakes Dep. at 173.)

Plaintiff also notes that there were an extraordinary number of label conversions taking place. A label conversion is when the label changes, either because of a recipe change (which changes the ingredients listed on the labels), government regulation changes (such as the FDA requirement that trans fat be listed on all labels by 2006), a graphics change by the customer, or when a new line or type of soup is introduced. (Vedro Dep. at 187-88; Shoup Dep. at 62-65; Crawford Dep. at 55-56.) Plaintiff states that all of these occurred at the same time in 2004,

---

[23]Docket No. 28 Ex. E.

which created a massive amount of work for her.  (Vedro Dep. at 186-89; Crawford Dep. at 55-56[24].)

Plaintiff also notes that her workload increased because Oakes and Shoup decided to change the part number for every item in the system.  (Vedro Dep. at 71-72; Shoup Dep. at 65.) Every item in the system had a different six-digit number.  Labels had been identified with a prefix of 33.  Shoup suggested changing the prefix to LW, meaning label wrap, then to LF, for label front, and then to LWF. (Vedro Dep. at 76-78, 188-89).  This resulted in Plaintiff having to change the numbers for thousands of SKUs.[25]  (Vedro Dep. at 71-72; Crawford Dep. at 58-59.) This process was then repeated for the finished goods number, which Oakes also wanted changed.  (Vedro Dep. at 71-72.)  This also had to been done every single time there was a change to a label (such as the recipe) as the new part number would also change.  (Vedro Dep. at Dep. at 188-89.)  This substantially increased her workload.  (Vedro Dep. at 186-87.)

Plaintiff complained on several occasions that her job duties had increased significantly and that she needed help.  (Crawford Dep. at 54-57.)  However, Oakes refused to give her any assistance, which she contends left her doing more work, for less pay, than the other employees in the department.  Plaintiff notes that Gretchen Crawford, one of the managers in the department, believed that Plaintiff did need assistance, and was not aware of anyone that disagreed that her workload had increased. (Crawford Dep. at 62.)

DOL Audit

Heinz and Del Monte consistently had treated the Materials Planner position as exempt from the overtime pay requirements of the Fair Labor Standards Act.  However, in June 2005, the

---

[24]Pl.'s App. Tab 32.

[25]An SKU (stock keying unit) is a unique piece of paper that serves as a label to identify a product; there may be many different SKUs for various buyers even if the content of the can is the same.  (Oakes Dep. at 47-48.)

Department of Labor (DOL) audited Del Monte and reviewed the exempt status of certain of Del Monte's exempt salaried positions.  After its investigation, the DOL concluded that five such positions – including the Materials Planner position – should be reclassified by Del Monte as non-exempt and that the sixty-two employees, including Plaintiff, in those positions were owed overtime pay.  Del Monte made full back wage payments to all reclassified employees, including Plaintiff.  (Sennett Decl. ¶ 5 & Ex. 1[26]; see also Vedro Dep. at 154, 159.)

Prior to the DOL's June 2005 audit, Del Monte's compensation structure assigned all non-exempt positions a salary grade between 3 and 8.  That is, grade level 8 was the highest possible salary grade that could be assigned to a non-exempt position.  (Sennett Decl. ¶ 6 & Ex. 2.)  After the audit, Del Monte revised its compensation structure to include two newly created non-exempt grade levels – a non-exempt 9 and a non-exempt 10.  Del Monte then changed the salary grades of all sixty-two affected employees to one of the two new non-exempt grade levels (which did not decrease their compensation).  Del Monte placed Plaintiff in the non-exempt grade level 10, the highest non-exempt grade level.  (Sennett Decl. ¶ 7.)  Uhrig's position was not classified as non-exempt by the DOL.  (Sennett Decl. ¶ 8.)

Procedural History

Plaintiff filed a charge of discrimination with the EEOC on June 29, 2004.  (Vedro Dep. at 218-19 & Ex. 25.)  A Notice of Right to Sue letter was issued on October 20, 2004.  Plaintiff filed this action on November 12, 2004.

Count I of the Complaint alleges that Defendant discriminated against Plaintiff on the basis of her race in violation of Title VII.  Count II alleges that she was subjected to racial harassment in violation of Title VII.  Count III that she was subjected to sex discrimination in violation of  Title VII.  Count IV alleges that she was retaliated against for having complained

---

[26]Docket No. 28 Ex. B.

about discrimination, in violation of Title VII.  Count V alleges violations of the Equal Pay Act.

Count VI alleges that she was subjected to sex discrimination, racial discrimination, racial

harassment and retaliation in violation of the PHRA.

Standard of Review

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving

party, "the pleadings, depositions, answers to interrogatories and admissions on file, together

with the affidavits, if any, show that there is no genuine issue of material fact and the movant is

entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  Summary judgment may be

granted against a party who fails to adduce facts sufficient to establish the existence of any

element essential to that party's case, and for which that party will bear the burden of proof at

trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party bears the initial

burden of identifying evidence which demonstrates the absence of a genuine issue of material

fact.  Once that burden has been met, the non-moving party must set forth "specific facts showing

that there is a genuine issue for trial" or the factual record will be taken as presented by the

moving party and judgment will be entered as a matter of law.  Matsushita Elec. Indus. Corp. v.

Zenith Radio Corp., 475 U.S. 574, 587 (1986).  An issue is genuine only if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party.  Anderson v.

Liberty-Lobby, Inc., 477 U.S. 242, 248 (1986).

Counts I, III, VI – Title VII/PHRA Claims of Sex and Race Discrimination

Plaintiff alleges that Del Monte discriminated against her in terms of her compensation

on the basis of her sex and/or race, in violation of both Title VII and the PHRA.  Del Monte

moves for summary judgment with respect to these claims on the grounds that: (1) Plaintiff's

Materials Planner salary was established by Heinz in June 2000 and therefore any claim based on

it is time barred and it fails on the merits in any case; (2) her disagreement with Del Monte's

19

business judgment as to the appropriate grade level for her Materials Planner position does not

state a claim for discrimination; and (3) her comparison to the salaries of individuals who are not

similarly situated is insufficient as a matter of law to state a claim for discrimination.

Title VII provides that it is an unlawful employment practice for an employer to

discriminate against an individual with respect to conditions of employment because of her

gender or race.  42 U.S.C. § 2000e-2(a).  The PHRA provides, inter alia, that it is an unlawful

employment practice:

> For any employer because of the race [or] . . . sex . . . of any individual . . . to
> otherwise discriminate against such individual . . . with respect to . . .
> compensation, hire, tenure, terms, conditions or privileges of employment or
> contract, if the individual . . . is the best able and most competent to perform the
> services required.

43 P.S. § 955(a).  Claims brought under the PHRA are analyzed under the same standards as

claims under Title VII.  See Burgh v. Borough Council of Borough of Montrose, 251 F.3d 465,

469 (3d Cir. 2001) (race discrimination); Goosby v. Johnson & Johnson Med., Inc., 228 F.3d

313, 317 n.3 (3d Cir. 2000) (sex discrimination).

In the absence of direct evidence of discrimination, a plaintiff may establish a prima facie

case of discrimination indirectly following the shifting burden analysis set forth by the Supreme

Court in McDonnell Douglas v. Green, 411 U.S. 792, 802 (1973) and refined in Texas

Department of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).  As the Court of

Appeals for the Third Circuit has stated:

> The existence of a prima facie case of employment discrimination is a
> question of law that must be decided by the Court.  It requires a showing that: (1)
> the plaintiff belongs to a protected class; (2) he/she was qualified for the position;
> (3) he/she was subject to an adverse employment action despite being qualified;
> and (4) under circumstances that raise an inference of discriminatory action...

Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003) (footnote and citations omitted).

20

If the employee presents a prima facie case of discrimination, the employer must "articulate some legitimate, nondiscriminatory reason for the [adverse employment action]." McDonnell Douglas, 411 U.S. at 802.  If the employer specifies a reason for its action, the employee must have an opportunity to prove the employer's reason for the adverse employment action was a pretext for unlawful discrimination.  Id. at 804.  The Court of Appeals has stated that:

> [T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered  legitimate  reasons must allow a factfinder to reasonably infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action  (that is, the proffered reason is a pretext).

Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted).

Time Bar to 2000 Salary Claim

Defendant's first argument is that Plaintiff's claim based on her 2000 salary should be dismissed because she did not file her charge of discrimination until June 29, 2004,  and, therefore, this claim is untimely.  A charge of discrimination must be filed with the EEOC within 300 days of the adverse employment action.  42 U.S.C. § 2000e-5(e)(1); Watson v. Eastman Kodak Co., 235 F.3d 851, 854 (3d Cir. 2000).

Plaintiff argues that the Court of Appeals has held that, in a case asserting discrimination in pay, each paycheck represents a continuing violation.  Cardenas v. Massey, 269 F.3d 251, 258 (3d Cir. 2001).[27]  However, the last paycheck Plaintiff received that related to this alleged discrimination in pay was in January 2001, three and a half years before she filed her EEOC charge.  (Vedro Dep. at 79-81.)

------

[27]The Cardenas case was decided in 2001, prior to the Supreme Court's decision in Morgan, discussed herein.  Cardenas may no longer be good law.  Because Plaintiff's claim relating to her 2000 salary is time-barred under any standard, the Court need not resolve this issue.

Plaintiff argues that she was subjected to an "ongoing pattern of discrimination" in that she was first treated differently as to her starting salary and then treated differently than Bridget Uhrig by being placed at salary grade 12.  However, the Supreme Court has held that:

> discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.  Each discrete discriminatory act starts a new clock for filing charges alleging that act.  The charge, therefore, must be filed within the 180- or 300-day time period after the discrete discriminatory act occurred.

National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002).  The 2000 salary is a discrete issue from the 2004 reevaluation of her salary and readjustment to grade 12.  Therefore, the claim relating to her 2000 salary is time barred and not actionable.

### Plaintiff's Grade Level Readjustment

With respect to the 2004 readjustment of Plaintiff's salary, Del Monte notes that she has pointed to the decision-making process, which it admits resulted in and created confusion from August 2003 until June 2005.  However, it argues that this confusion does not justify an inference of unlawful sex or race discrimination.  Del Monte points out that its initial determination that her position merited no more than a salary grade level 10 was independently confirmed by the 2005 DOL audit and finding that the Materials Planner position, along with the positions of 61 other employees, should be classified as non-exempt.  Under its then-existing grade level structure, Plaintiff's salary grade should have been, at most, a level 8.  Once the DOL made its determination, Del Monte created two non-exempt grade levels (which did not result in any decrease in the affected employees' compensation) and placed Plaintiff in the higher of the two new grade levels, a level 10, which was consistent with its initial judgment about the position.

Plaintiff focuses on the fact that Del Monte only downgraded her -- and not Bridget Uhrig -- to a salary grade 12. According to Kennedy, he changed Plaintiff to a salary grade 12 because he was never comfortable with increasing her to a salary grade 13 based solely on the recommendation of Oakes that she be made bonus eligible. (Kennedy Dep. at 58-62.)[28] Plaintiff contends that this fails to explain why he did not do a re-evaluation for Uhrig, who had also been changed to a salary grade 13 based solely on Oakes's recommendation. In fact, Kennedy concedes that he had no reason to believe that Uhrig's increase to a salary grade 13 was more justified than Plaintiff's. (Kennedy Dep. at 87-89.)

Moreover, Plaintiff asserts that Kennedy admitted that Oakes told him that Plaintiff had a $4.5 million budget while Uhrig only had a $1.3 million budget. (Kennedy Dep. at 110-13, 115-16; Oakes Dep. at 48-49, 52-53.[29]) Plaintiff also had vendor contact, another factor in determining salary grade, while Kennedy's notes are silent as to whether Uhrig had vendor contact. (Kennedy Dep. at 113, 116; Oakes Dep. at 49-51.) Kennedy also conceded that Oakes, being their supervisor, had more knowledge about their jobs than he did. (Kennedy Dep. at 64.) Kennedy admitted that his re-evaluation of Plaintiff's position was an action that was rarely, if ever done, for employees at Del Monte. (Kennedy Dep. at 63-64.)

According to Kennedy, he singled Plaintiff out because she was looking for more money. However, Plaintiff observes that, although she inquired as to whether she would be paid the minimum for a salary grade 13 position, Kennedy admitted that he could have simply told her that more money does not come with a pay grade increase that was related to harmonization

---

[28]Pl.'s App. Tab 29.

[29]Pl.'s App. Tab 30.

rather than promotion.  (Kennedy Dep. at 37-38, 48-50, 55-58; Sennett Dep. at 44-45[30].)  In fact, Kennedy did not even need to be involved in responding to Plaintiff's questions regarding whether she would receive a raise, as that was the responsibility of the HR Generalist, Lisa Sennett, not him.  (Kennedy Dep. at 59.)  Plaintiff argues that it is telling that Kennedy could not explain why he did not simply refer that question to Sennett with instructions that she inform Plaintiff that there was no pay increase that went with the salary grade change to 13.  (Kennedy Dep. at 55, 58-59, 79-80.)

Del Monte argues that Plaintiff's challenges to the process – her position was reevaluated and downgraded to a grade 12 but Bridget Uhrig's was not – cannot support a claim for racial discrimination when Kennedy was not aware of her race at the time and when the DOL independently confirmed that the Materials Planner position was non-exempt but that Uhrig's Label Development Specialist position was not.  Plaintiff's only response to this argument is to misconstrue Del Monte's position as being that it relied on the DOL audit in 2005 to decide her salary grade a year before.  She argues that:

> As Del Monte knows, the actions and decision by Mr. Kennedy that are the subject of this case took place in the spring and summer of 2004, long before the DOL became involved.  Del Monte was therefore not acting in accordance with any decision or guidance of the DOL when it discriminated against Ms. Vedro.

(Docket No. 29 at 21.)

Del Monte is not contending that the market evaluation was conducted because of the DOL audit.  Rather, it has offered the result of the 2005 DOL audit as further support for its decision (reached in 2004) that Plaintiff's position was properly assessed.  The DOL confirmed in 2005 that Plaintiff's Materials Planner position was non-exempt (that is, salary grade 8 or lower) but that Uhrig's Label Specialist position was not.  Thus, regardless of the process by

_____

[30]Pl.'s App. Tab 31.

24

which Del Monte came to reevaluate and readjust Plaintiff's salary, she has pointed to no evidence that the decision itself constitutes evidence of racial discrimination.

Moreover, Plaintiff has provided no support for her theory that she can support a claim for discrimination based on the check she received on June 14, 2004 on the grounds that it was an attempt to "buy her silence."  The essence of her claim is that the 2004 grade level readjustment was an instance of racial discrimination in pay and, thus, the fact that she received more pay undermines, rather than supports, her cause of action.

"The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is discrimination." Keller v. ORIX Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir. 1997) (en banc) (citation omitted).  Plaintiff has pointed to no evidence from which the trier of fact could conclude that Del Monte's reevaluation of her salary grade level and readjustment of it to a level 12 was an instance of unlawful race discrimination.

Comparison to Other Employees

Finally, Plaintiff compares herself to a number of other individuals to complain that her (allegedly) lower salary must be the result of race discrimination.  Del Monte argues that these individuals are not similarly situated to her.

Del Monte contends that Plaintiff's job and Uhrig's were "entirely different": one was a buying function and one was graphic design function.  (Vedro Dep. at 121; Oakes Dep. at 54-57[31].)  Plaintiff argues that their jobs were very similar: they worked in the department that planned the production of soup, and both worked with the soup labels.  Plaintiff's specific job was to plan, order and obtain soup labels.  (Vedro Dep. at 51.)  She used various forecasting tools to estimate the number of labels that would be required for all of the different brands and types of soups that Del Monte makes.  (Vedro Dep. at 51-53.)  Uhrig's job was immediately before

---

[31]Docket No. 28 Ex. C.

Plaintiff's in the chain.  She was the liaison between the separator, the designer and the customer. The designer would send a template of the label to Uhrig, who would proof the variety numbers, match the label with a color chart, clear it through government affairs, and send it to the printer. (Vedro Dep. at 123-25; McMullan Dep. at 16[32].)

Plaintiff contends that an examination of the jobs performed by her and the other members of the department shows that they were also substantially the same.  Plaintiff worked with customers and the factory to order specific quantities of the labels that went on the soup cans.  Gretchen Crawford submitted the production plan to the factory, which then made the amount of soup ordered.  Afterward, Lynn Ferri, Laura Mauro and Dennis Rich moved the finished soup to the distribution centers.  (Vedro Dep. at 155-57.)  All were part of the production of the soup, although only Crawford, their supervisor, actually "planned production." (Crawford Dep. at 48-50.)[33]

Plaintiff states that she spoke to Anita Sutara, a former Co-Pack Accountant in the Finance department and salary grade level 12, and PPIC Analysts (grade level 20) in her department Lynn Ferri, Laura Mauro, Dennis Rich and Sarah Shodi.  However, she does not know what their salaries were.  (Vedro Dep. at 199-203.)

As Plaintiff explained, PPIC Analysts are responsible for ensuring that finished goods find their way to the appropriate distribution centers.  Specifically, once the factory approves the production plan for the finished goods, "Laura, Lynn and Dennis are in charge of those finished

---

[32]Pl.'s App. Tab 33.

[33]Pl.'s App. Tab 32.

goods.  They move the finished goods from the factory to whatever distribution center needs to have them in their inventory."  (Vedro Dep. at 156; see also Crawford Dep. at 26.[34])

Shodi, who later became a Demand Planner, managed the consensus forecast process for Del Monte, which included coordinating the marketing, sales, and statistical forecasts to develop an agreed-upon forecast to use for operations and sales planning.  (Crawford Dep. at 25-26.)  At all times with Del Monte, Sutara was a member of the Finance department, and she was not supervised by the same people who supervised Plaintiff.  In her position, which required a thorough understanding of accounting, Sutara tracked inventory at factories that manufactured products for Del Monte.  (Vedro Dep. at 200 & Ex. 4; Sennett Dep. in Eason case at 65.[35])

Plaintiff has not supplied extrinsic evidence of the pay rate of the employees she considers to be comparable.  This represents a failure on her part to make the required evidentiary showing to sustain an unlawful compensation claim and is properly dismissed on a motion for summary judgment.  See Watson v. Eastman Kodak Co., 235 F.3d 851, 857 (3d Cir. 2000).[36]

Morever, even if she had produced evidence as to the salaries of Anita Sutara, Lynn Ferri, Laura Mauro, Dennis Rich and Sarah Shodi, she has not demonstrated that these individuals are similarly situated to her.  By her own testimony, PPIC Analysts and Demand Planners perform

---

[34]Docket No. 28 Ex. E.

[35]Docket No. 28 Ex. H.

[36]Although not specifically addressed by the Defendant, these findings appear equally applicable to Plaintiff's Equal Pay Act claim, where a plaintiff must establish that his or her employer paid different salaries to employees of the opposite sex for equal work.  Byrnes v. Herion, Inc., 764 F.Supp. 1026, 1030 (W.D.Pa. 1991)("A party asserting a claim under the Equal Pay Act [29 U.S.C. § 206(d)] bears the initial burden of proving that his/her employer pays different wages to employees of opposite sexes for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.") (internal quotation and citations omitted).

different work not comparable to hers.  Plaintiff herself indicated in her deposition that her position with the company was "unique."  (Vedro Dep. at 146.)

Sutara, an accountant, worked in a different department (finance rather than production planning and inventory control) and had a different supervisor.  (Vedro Dep. at 200 & Ex. 4; Sennett Dep. in Eason case at 65 & Ex. 9.)  A plaintiff is not similarly situated to employees in different departments with different job responsibilities.  See Hill v. GMAC Mortgage Corp., 2002 WL 32341950, at *4 (E.D. Pa. Oct. 17, 2002); Northern v. City of Phila., 2000 WL 355526, at *3 (E.D. Pa. 2000); Bullock v. Children's Hosp. of Phila., 71 F. Supp. 2d 482, 489 (E.D. Pa. 1999).

Del Monte maintains that the only other individual whose duties were similar to Plaintiff's was Teresa Ecrement, who was not a Del Monte employee but who was employed by Del Monte's then-preferred label printer, Renaissance Mark, and merely worked on-site at Del Monte.  (Vedro Dep. at 51, 78-79, 146.)  Plaintiff has not responded to this argument.

Therefore, with respect to Counts I, III and the discriminatory pay claim in Count VI, Defendant's motion for summary judgment should be granted.

### Counts II, III, VI - Title VII/PHRA Claims of Sexually and/or Racially Hostile Work Environment

Plaintiff alleges that Del Monte subjected her to a sexually and/or racially hostile work environment, in violation of both Title VII and the PHRA.  As noted above, claims brought under the PHRA are analyzed under the same standards as claims under Title VII.  See Weston v. Commonwealth of Pa., 251 F.3d 420, 425 & n.3 (3d Cir. 2001) (sexually hostile work environment); West v. Philadelphia Elec. Co., 45 F.3d 744, 753 (3d Cir. 1995) (racially hostile work environment).

The United States Supreme Court has held that a plaintiff may establish a Title VII violation if she can show that discrimination based on sex created a hostile or abusive working

environment.  Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998).  The Court of Appeals

has held that a plaintiff must demonstrate that:

> (1) she suffered intentional discrimination because of her [sex]; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present.

Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006) (citations and footnotes omitted).  The same

standards apply to a racially hostile work environment.  See West, 45 F.3d at 753.[37]

Del Monte moves for summary judgment with respect to these claims on the grounds

that: (1) Plaintiff cannot demonstrate that any of the conduct about which she complains occurred

"because of" her race or gender; (2) the conduct was neither severe nor pervasive; and (3) she

cannot establish that she was subjected to an objectively hostile work environment.  Plaintiff has

not directly responded to these arguments.[38]

### Was the Conduct "Because of" Sex or Race?

The Supreme Court has stated that:

> Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at "discriminat[ion] ... because of ... sex." ...  "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed."

Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998) (quoting Harris v. Forklift

Sys., Inc., 510 U.S. 17, 25 (1993)).

Del Monte argues that the alleged harassing conduct was not "because of" Plaintiff's sex

or race.  Plaintiff acknowledges that she was never subjected to any racial or sexist slurs, epithets

---

[37]As the Supreme Court has noted, it relied upon cases recognizing liability for discriminatory harassment based on race and nation origin when it first delineated the standards for a hostile work environment based on sex.  Faragher, 524 U.S. at 786.

[38]Plaintiff refers to the email incident as "the most outrageous example of Mr. Oakes' harassment and retaliation against [her]."  (Docket No. 29 at 10.)  This is discussed below.

or other derogatory remarks or conduct.  (Vedro Dep. at 90-92, 95.)  However, she asserts that a comment made by Oakes to another employee demonstrates his racial animus.  Plaintiff avers that Oakes told Sarah Shodi that whenever he saw a group of black men walking down the same street as he, he automatically thought that they were going to rob him and that Shodi, who is Caucasian, was offended by this because one of her best friends is a black man.  (Vedro Dep. at 95-96.)  Plaintiff also notes that Oakes admitted that, during his entire career with Del Monte, he never hired an African-American to any of the direct-report positions below him.  (Oakes Dep. at 41-42.)[39]

Del Monte responds that Plaintiff has presented only her own far-removed version of Oakes's story.  Oakes, who was asked about it at his deposition, stated that he told Shodi about a specific incident in which he was robbed by a group of men (who happened to be black) when he was visiting Oakland, California, that it was disturbing to him for five or six days afterward and that he was not "fearful" of anyone.  (Oakes Dep. at 31-32.)[40]  Moreover, even accepting Plaintiff's version of the discussion, a single race-based comment, when not directed to or heard by a plaintiff and unrelated to any contested employment decision, is not sufficient to establish a racially hostile work environment.  See Goodwine v. PHB Die Casting, 2005 WL 2897403, at *5 (W.D. Pa. Nov. 18, 2005).

Del Monte argues that almost all of the actions Plaintiff cites were not directed at her individually and do not support an inference of discrimination: the increased workload was the result of business reasons and affected everyone in the department (as she admits), no one in her department obtained APICS certification, and the delay in her performance review and critical

---

[39]Pl.'s App. Tab 30.

[40]Docket No. 31 Ex. A.

comments by Oakes about the labeling ordering problem also applied to Margie McMullan and did not affect Plaintiff's center-tier rating.

The only incident of alleged harassment that arguably could have affected Plaintiff exclusively was the July 21, 2004 comment by Oakes about her email message to Gretchen Crawford.  However, Del Monte points out that this comment had no connection to Plaintiff's race or gender and it never affected the terms or conditions of her employment.  See Walton v. Mental Health Ass'n of Southeastern Pa., 168 F.3d 661, 667 (3d Cir. 1999) ("The fact that [a supervisor's] behavior toward Walton may have been offensive does not indicate that it was based on Walton's disability.")  Even if Oakes's single comment could be described as "offensive" (and Plaintiff has not made this argument), it does not support an inference that she was subjected to a hostile work environment based on her race or gender merely because she is an African-American female.

Was the Conduct Severe or Pervasive?

Del Monte also argues that the conduct to which Plaintiff points was not pervasive or severe.  It notes that a court must look to many factors, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether it unreasonably interferes with an employee's work performance." Weston, 251 F.3d at 426 (citations omitted).

Plaintiff cites Oakes's single comment about her email message to Gretchen Crawford, her delayed performance review, her increased workload and Oakes's refusal to send her to APICS training.  These incidents, whether considered alone or in combination, do not meet the "severe or pervasive" criterion of a hostile work environment.  They cannot be described as frequent, severe, physically threatening or humiliating, or comments that unreasonably interfered with Plaintiff's work performance.

Plaintiff focuses on Oakes's comment about her email message and contends that his explanation of what bothered him about it changed over time.  Initially, he accused her of using an improper tone and font in her email.  (Pl.'s Ap. Tab 23.)  However, he later alleged that it was the use of bold and underline that he objected to.  (Jenkins Dep. at 70-72.)

Plaintiff notes that Oakes was unable to identify any other time during his long career with Del Monte where he had objected to someone underlining a word or placing a word in bold print in an email, even though he admitted that he probably received such emails in the past. (Oakes Dep. at 194.)  In fact, Oakes even admitted that he himself had used underlining, bold, both underlining and bold, and different fonts, in emails and memos in the past.  (Oakes Dep. at 192-93.)

Plaintiff also contends that Connie Jenkins had a bias in favor of Oakes and Del Monte because in her email to Richard Muto, she referred to things Oakes had told her as things he had "said," but referred to things Plaintiff had told her as things she had "claimed."  She notes that Jenkins agreed that saying that one person "said" something while another person "claimed" something was not the same thing, but denied that by doing so she was suggesting that she believed Oakes.  (Jenkins Dep. at 82-84.)

Plaintiff further argues that Jenkins's bias was shown by the fact that she accused Plaintiff of having "selectively" chosen not to send a particular email to her.  Jenkins admitted that she had absolutely no evidence whatsoever that this was an intentional omission by Plaintiff as her email implied.  (Jenkins Dep. at 84-87.)

Moreover, Plaintiff contends that Jenkins's bias was further revealed by her statement that she "hoped" that her investigation was the end of the issue.  Plaintiff notes that Jenkins stated at her deposition that she hoped at the time that Plaintiff would not file a formal charge of retaliation against Del Monte.  (Jenkins Dep. at 88-90.)

Plaintiff notes that although Jenkins recognized that there were concerns when the same person who is the subject of an EEOC complaint is being accused of retaliation, she did not take the simple step of recommending that Plaintiff be removed from Oakes's supervision to prevent the possibility of any further retaliation.  (Jenkins Dep. at 55-57.)  Plaintiff focuses on the fact that Jenkins began to advise and assist Oakes in preparing his performance evaluation for Plaintiff that, she contends, would be critical of her performance without appearing to be further retaliation for her EEOC complaint.  Jenkins indicated that she was suggesting words that Oakes could put into the evaluation.  (Jenkins Dep. at 53-55, 91-97.)  Plaintiff argues that the HR Generalist assigned to that department, Lisa Sennett, would typically advise Oakes on performance evaluations and thus Jenkins's participation is a mystery.  (Jenkins Dep. at 101-02.)

As Del Monte observes, Plaintiff has attempted to create a "federal case" out of these trivial distinctions.  The differences in meaning between "bold and underline" and "tone and font" and between "said" and "claimed" do not demonstrate that what Oakes said or what Jenkins concluded in her investigation are examples of discriminatory conduct, much less the severe or pervasive conduct necessary to demonstrate a hostile work environment.

In addition, the fact that Plaintiff can articulate other ways in which her complaint could have been handled does not demonstrate that the way Del Monte chose to handle it constitutes evidence of discrimination.  Finally, Plaintiff cites no support for her extraordinary suggestion that when Jenkins made a comment to Oakes that he make clear in Plaintiff's performance evaluation that his criticism of her ordering excess labels was not retaliation against her, Jenkins's comment was itself an example of retaliation discrimination.

<u>Would the Incidents Have Detrimentally Affected Other Female Employees?</u>

Finally, Defendant argues that Plaintiff has not demonstrated that the alleged discrimination would have detrimentally affected a reasonable person of the same sex and/or race

33

in her position.  This factor "protects the employer from the 'hypersensitive' employee."

Andrews v. City of Phila., 895 F.2d 1469, 1483 (3d Cir. 1990).  Upon review, the Court should

find that she has presented no evidence from which the trier of fact could conclude that a

reasonable person would agree that she was subjected to a hostile work environment based upon

the incidents she cites.  Therefore, with respect to Counts II, III and the hostile work environment

claim in Count VI, Defendant's motion for summary judgment should be granted.

      Counts IV, VI - Retaliation Claims

In Counts IV and VI, Plaintiff alleges that Defendant retaliated against her for engaging in

protected activity in violation of Title VII and the PHRA, respectively.  Del Monte moves for

summary judgment as to these claims on several grounds.

Discrimination against an individual who has opposed a practice prohibited by Title VII

or who has made a charge, testified, assisted or participated in any manner in an investigation,

proceeding or hearing under Title VII is itself actionable conduct.  42 U.S.C. § 2000e-3(a).  The

same is true under the PHRA.  43 P.S. § 955(d).

The Court of Appeals has long held that:

> To establish a prima facie case of retaliation, a plaintiff must show that:
> (1) he or she engaged in a protected employee activity; (2) the employer took an
> adverse employment action after or contemporaneously with the protected
> activity; and (3) a causal link exists between the protected activity and the adverse
> employment action.

Weston, 251 F.3d at 430 (citations omitted).  The PHRA follows the same standards.  Woodson

v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997).

Defendant does not challenge the fact that Plaintiff engaged in protected activity and the

law is clear that her EEOC charge filed on June 29, 2004, as well as her complaints to Del

Monte, constitute protected activity for purposes of Title VII and the PHRA.  Abramson v.

William Paterson College of N.J., 260 F.3d 265, 287-88 (3d Cir. 2001).  However, Defendant

34

contends that Plaintiff cannot point to any evidence of an adverse employment action and that she cannot demonstrate a causal connection between her protected activity and the decisions about which she complains.

    <u>Adverse Employment Action</u>

    Del Monte argues that Plaintiff did not suffer any adverse employment action in response to her EEOC charge.  Plaintiff responds that:

> she was reprimanded for an innocuous email; she was made a scapegoat for an excess of label inventories, with the same appearing on her performance evaluation; she was subjected to an ever-increasing workload without any assistance being provided to her; and she was the only person in her department to be denied a requested training program.

(Docket No. 29 at 24.)

    The Court of Appeals has held that:

> in deciding a Title VII retaliation claim ... "retaliatory conduct must be serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment."  As such, in cases not involving actual discharge or refusal to hire, courts may find unlawful retaliatory conduct "only if it alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee."  "[U]nsubstantiated oral reprimands" and "unnecessary derogatory comments" are not serious and tangible enough to constitute adverse employment actions.

<u>Caver v. City of Trenton</u>, 430 F.3d 243, 255 (3d Cir. 2005) (quoting <u>Robinson v. City of Pittsburgh</u>, 120 F.3d 1286, 1300, 1301 (3d Cir.1997) (footnote omitted).

    Plaintiff provides no evidence that she suffered an adverse employment action, that is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing a significant change in benefits."  <u>Weston</u>, 251 F.3d at  431 (3d Cir. 2001) (citation omitted).  As noted above, some of the actions to which she points affected others as well: both she and Margie McMullan were cited for the excess label inventories (yet the criticism did not affect their salaries and she provides no support for her claim that Oakes's comments in

her review were "career crippling") and others were subjected to the increased workload (which resulted from business reasons and which she told Oakes she could handle).  She has not supported her contention that no one else requested APICS training and she points to no evidence from which a trier of fact could conclude that Oakes's explanation about his business reason for denying her request for the training (budgetary constraints) is a pretext for unlawful retaliation discrimination.

Finally, Plaintiff cites the email incident as the "most outrageous" example of alleged harassment, which she continues to refer to as "discipline."  Oakes has stated that he did not consider anything he said to be disciplinary in nature and the record is undisputed that his comment affected no change in her employment status.  Thus, she has not demonstrated that she suffered an adverse employment action and cannot state a prima facie case of retaliation discrimination based on the incidents alleged.

It is noted that the Supreme Court recently altered the analysis for evaluating retaliation claims.  The Court rejected the position taken by the Third Circuit and others that an employee must point to an adverse employment action: "the anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment."  Burlington N. & Santa Fe Ry. Co. v. White, 126 S.Ct. 2405, 2412-13 (2006).  However, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Id. at 2415 (citations omitted).

As explained above with respect to Plaintiff's hostile work environment claim, she has produced no evidence from which a trier of fact could conclude that a reasonable employee would have found the actions she cites "materially adverse."  Thus, even under the Supreme Court's latest formulation, Plaintiff has not stated a prima facie case of retaliation discrimination.

Therefore, with respect to Count IV and the retaliation claim in Count VI, Defendant's motion for summary judgment should be granted.

For these reasons, it is recommended that the motion for summary judgment submitted on behalf of Defendant (Docket No. 25) be granted.

Within ten (10) days of being served with a copy, any party may serve and file written objections to this Report and Recommendation.  Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

Respectfully submitted,


/s/ Amy Reynolds Hay
AMY REYNOLDS HAY
United States Magistrate Judge

Dated:    15 August, 2006


cc:    Hon. Terrence F. McVerry
       United States District Judge

       Homer L. Walton, Esquire
       Leta V. Pittman, Esquire
       Scott Leah, Esquire
       Tucker Arensberg
       1500 One PPG Place
       Pittsburgh, PA 15222


       Christopher K. Ramsey, Esquire
       Beth M. Henke, Esquire
       S. Beth Gollmar, Esquire
       Morgan Lewis & Bockius LLP
       One Oxford Centre, 32nd Floor
       Pittsburgh, PA 15219